Robert L. SCHMIDT, Appellant,

v.

Doris M. LASHLEY, Appellee.

No. 4507.

Supreme Court of Alaska.

April 24, 1981.

Charles K. Cranston, Cranston, Walters, Dahl & Jarrell, Anchorage, for appellant.

Theodore L. Carson, Jr., Soldotna, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and COOKE, Superior Court Judge.

MATTHEWS, Justice.

Robert Schmidt has appealed from an order of the superior court in Kenai permanently enjoining him from prosecuting *Schmidt v. R-Lee Seafoods, Inc., et al.*, an action against his former wife and the close corporation of which both were principal shareholders. We believe the lower court correctly ordered the injunction and we affirm its ruling.

In November, 1976, Robert Schmidt filed for divorce from his wife Doris, now Doris Lashley. On May 13, 1977, the divorce was granted, with the question of property division postponed. Robert and Doris signed a handwritten agreement on June 7, 1977, "to settle all matters relevant to the Alaska Corp. known as R-Lee Seafoods, Inc., except as otherwise preserved herein (valuation of shares)." Under the agreement, each party was to retain his or her present stock ownership and the corporation was to redeem Robert's shares. The agreement contained language of a mutual release, stating, "Parties release each other as to corp. matters, agree to release the corp. assets from the effect of a Lis Pendens filed in the above divorce action." This agreement was specifically incorporated into a larger property division and child custody agreement entered into by the parties on June 8, and filed with the court on October 14, 1977. In December, the superior court entered findings of fact and issued a divorce decree *nunc pro tunc* as of May 13.

Six months later Robert filed *Schmidt v. R-Lee Seafoods, Inc., et al.*, on behalf of himself and all other shareholders of the corporation. The complaint alleged improper issuance of stock to Doris by the corporation and personal use by Doris of corporate funds. Doris responded in August by moving, as part of the divorce action, for an injunction against Robert's prosecution of his suit. In granting the injunction, the superior court held that Robert's action was in clear violation of the June 7 agreement and was vexatious. Doris received an award of substantially all her costs and attorney's fees.

In his appeal Robert first argues that the filing of his suit was not in violation of the June 7 agreement because the agreement did not determine just what the assets of R-Lee Seafoods were.[1] The agree-

---

1. The June 7 agreement signed by Robert and Doris stated as its purpose:

    To settle all matters relative to the Alaska Corp. known as R-Lee Seafoods, Inc., except as otherwise preserved herein (valuation of shares). The parties intend to litigate the distribution of "non-corporate" assets which were involved in their marriage and listed as Exhibit A attached.

    It also stated:
    The terms hereof are agreed to be a fair, just, and equitable settlement of the parties respective rights in the "corp."....  *Shares*: Each of the parties hereto shall retain the shares presently issued in his/her name, and each waives the right to contest the validity of said shares ... *Redemption*: Corp. shall redeem ex-husband's common and preferred

ment, however, plainly stated that it was intended to settle *all* matters relative to R-Lee except valuation,[2] and Robert's suit did not challenge the valuation procedure.[3] Moreover, the court below found, with ample evidence in the record to support its finding, that the self-dealing complained of in Robert's suit pre-dated the divorce and Robert had full knowledge of Doris' alleged transgressions at the time he signed the agreement. The court further found that the agreement was the product of protracted negotiations between the parties and their attorneys.

■ Robert does not dispute those findings and has failed to demonstrate any ambiguity in the agreement, or to propose a plausible alternative reading. In light of this we cannot conclude that the superior court erred in finding that the parties intended to settle all disputes related to the corporation, including any prior use or misuse of its assets by Doris.[4]

Robert argues in the alternative that even if the agreement were intended to cover the substance of his lawsuit, he is not bound by it because it was not properly accepted by the corporation or approved by the court, as required by the terms of the agreement.[5]

Again we must disagree. The trial judge signed a judgment in August, prior to the entry of the permanent injunction on December 13, 1978, which incorporated by reference the property settlement agreement signed by Doris and Robert. That agreement incorporated the handwritten agreement regarding R-Lee Seafoods. The agreement was, therefore, adopted by the court as required.

In connection with corporate acceptance, Robert points to evidence in the record that the ratification was performed by a three-member corporate board and that the by-law requiring a five member board was never properly amended. There is also evidence to support a contrary finding. After reviewing the record, we cannot say that the trial court clearly erred in finding that the agreement had been accepted by the corporation to the extent intended by the parties. We also note that Robert was aware of the changed make-up of the board on June 7, 1977, and any right he might

shares ... *Surplus*: Redemption shall be effected out of surplus of the Corp. as defined for that purpose in A.S. Title 10. Ex-Wife and undersigned shareholder agree to cause the corp. to adhere to a formula and practice which will not materially distort the corp. accounts so as to frustrate the achievement of a "surplus" by the Corp. in the ordinary course of business; i. e., the corp. shall not pay "unreasonable compensation" ...., nor shall it declare dividends until redemption is completed.... *Release*: Parties release each other as to corp. matters, agree to release the corp. assets from the effect of a Lis Pendens filed in the above divorce action.

2. As to valuation, the agreement provided:
   The shares shall be promptly pledged, awaiting valuation. Valuation shall be made by a Court appointed appraiser whose fees shall be borne 50% by each ex-husband and ex-wife. The appraisal shall be of ex-husband's shares at Fair Market Value as of May 13, 1977, and the criteria shall be as in Internal Revenue Code Regulations relative to establishing values for estate tax purposes, i. e., Sec. 20.2031.

3. The complaint in *Schmidt v. R-Lee Seafoods, et al.*, charged, in essence, that the corporation

had wrongfully issued stock to Doris and a man named Frank Waldschmidt, thus diminishing Robert's stock equity in the corporation, and that Doris had diverted corporate funds in excess of $155,000.00 for construction and improvements on her personal property, both in Alaska and elsewhere.

4. A release is to be construed according to the intent of the parties, which is a question of fact. *Adams v. Dion*, 109 Ariz. 308, 509 P.2d 201, 202 (1973).

5. The agreement provided:
   This Agreement shall be stipulated for approval by the Court in the above action, and thereupon shall be binding upon and inure to the benefit of the parties hereto, their Personal Reps., heirs, successors, transferees, and assigns.... This agreement shall be effective when accepted by the corporation, and upon agreement by the corporation to be bound by its terms. *The undersigned shareholders agree to cause the corporation to accept and be bound by the foregoing.* [Emphasis added].

have had to object to the change was waived by the agreement.[6]

■ In the recent case of *Witt v. Watkins*, 579 P.2d 1065 (Alaska 1978), we discussed the nature of a release in the context of a personal injury action.[7] We stated that the preservation of agreements entered in good faith and the encouragement of dispute resolution are strong reasons for enforcing releases. We further noted that once the party relying on a release establishes that it was given with full understanding, the burden is on the releasor to show by clear and convincing evidence that the release should be set aside. *Id.* at 1068–70. Applying the relevant factors listed in *Witt* to the present case, we find that Robert did not meet that burden.[8]

■ We agree with the trial court that Robert's suit was vexatious and affirm its award of fees to Doris.

AFFIRMED.

---

**6.** This technical defense raised by Robert is also inconsistent with his agreement to cause the corporation to accept the agreement. Any failure to gain corporate acceptance is at least partially attributable to his own lack of cooperation and he cannot now be heard to complain.

**7.** It is immaterial that *Witt* involved a tort claim and Robert Schmidt's claims are related to corporate management and raised in a property *settlement context.* In either case a release is to be construed just as any other contract with the intent of the parties as the determinative factor. *See e. g. DiMarco v. DiMarco,* 60 Cal.2d 387, 33 Cal.Rptr. 610, 613–614, 385 P.2d 2, 6 (1963); *Thompson v. Thompson,* 170 Mont. 447, 554 P.2d 1111, 1114 (1976); *Mes-*

sersmith *v. Messersmith,* 68 Wash.2d 735, 415 P.2d 82, 85 (1966).

**8.** The court in *Witt* stated that the factors that may be considered in deciding whether a release should be set aside include, *inter alia,* the manner in which the release was obtained, including whether it was hastily secured at the instigation of the releasee, whether the releasor was represented by counsel, and whether he relied on representations of the releasee. Finally, the relative bargaining positions of the parties should be weighed. 579 P.2d at 1070. Here the release was the product of extended negotiations. Both sides were represented by counsel, were fully apprised of all relevant facts, and were bargaining as equals.